**ZUCKERMAN SPAEDER** LLP

399 PARK AVENUE   14TH FLOOR
NEW YORK, NY 10022-4614
212.704.9600   212.704.4256 fax   www.zuckerman.com

PAUL SHECHTMAN
Partner
646-746-8657
PShechtman@zuckerman.com

VIA ECF

March 14, 2016

Honorable Susan D. Wigenton
United States District Court
District of New Jersey
Martin Luther King Building
  & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

Re:   United States v. David Butler (12 CR 273)(SDW)

Dear Judge Wigenton:

This letter is respectfully submitted on behalf of David Butler, who will be sentenced on April 5, 2016, for violating the anti-trust laws in connection with municipal tax lien sales in New Jersey. As discussed below, David was a relatively minor participant in the bid rigging scheme; he has cooperated fully with the government; and he has lived an otherwise exemplary life marked by commitment to family and community. For all these reasons, we submit that a non-incarcerative sentence is the appropriate disposition in this case.

A.   Family and Employment History

David Butler was born in Philadelphia on May 13, 1953. His father was a carpenter, who had difficulty earning a living. Shortly after David was born, the family moved to Stratford, New Jersey, near Camden. When David was in fourth grade, he came home from



Honorable Susan D. Wigenton
March 14, 2016
Page 2

school to find the house padlocked; the bank had foreclosed on it. With assistance from an uncle, the family moved to Cherry Hill, where David has lived most of his life.

David attended college first at Camden County College and then at Glassboro State College. He paid for his own tuition by cleaning fish at the Reading Terminal in Philadelphia and tending bar. A talented artist, David graduated with a degree in art education and a plan to teach art in public school.

During his sophomore year in college, David met Maxine Wechsler, and the two became inseparable. The first day that they met, he told her that he would marry her some day. See Letter of Maxine Butler ("[f]rankly that scared me to death").[1] They have now been married for 40 years and have two children. Ari, 35, is an accomplished actor, and Lauren, 32, is a psychotherapist at Jefferson Hospital in Philadelphia. Maxine has been a practicing psychotherapist for more than 35 years, working with adolescents, adults and couples. Id. ("David has always supported me in my quest for professional development").

As Ari's and Lauren's letters to the Court attest, David has been a loving husband and dedicated parent. See Letter of Ari Butler ("[l]ove abounds and laughter fills our home"); letter of Lauren Butler Rosner (my father "has always been very involved in my life volunteering as my little league coach . . . helping me with my school projects . . . and he continues to be there for me through real-life adult dilemmas"). Others also describe the closeness of the Butler

---

[1] Letters from David's family and supporters are attached to this submission as Appendix A.

ZUCKERMAN SPAEDER LLP

Honorable Susan D. Wigenton
March 14, 2016
Page 3

family. See, e.g., Letter of Alan Cohen ("I have always told David he is the richest man I know because of the love and respect he receives from his children and family"); letter of Heather Seigle ("David lives his life in accordance with the [notion that] family is the greatest wealth").

David has worked hard his entire adult life. Across from the Reading Terminal was a plastic business, which David's father-in-law learned might be for sale. He bought it, and David, while still in his 20s, was soon running the company. David grew the business from one location to four before selling it and buying a design display company in Morristown. He more than doubled that business in size (it went from 35 to 70 employees) and began a relationship with Bed Bath & Beyond, which became his major client. In the next decade, he designed the interiors for more than 600 Bed Bath & Beyond stores. The display business allowed David to apply his artistic talents to a host of practical problems.

In 2002, during a round of golf, David Farber, a close friend, told David about the possibility of investing in tax liens that New Jersey municipalities were auctioning. That casual conversation led David into the tax lien business, first as a hobby and then as a full-time occupation. It is his involvement in the tax lien business that brings him before the Court.

B.  Criminal Conduct

After learning about the opportunity to invest in tax liens, David, David Farber, and four other friends started a tax lien club, in which each of the six members invested $25,000. In September 2005, what began as a club became an investment fund, named CCTS Tax Lien I, LLC. (The name came from Camden County Tax Sales, which is where liens were first



Honorable Susan D. Wigenton
March 14, 2016
Page 4

purchased.)  Between September 2005 and July 2008, CCTS purchased approximately $10 million in liens with funds from investors, who were relatives and friends, and a loan from a local bank.

Mr. Farber was the tax lien "guru": he developed the computer model that guided CCTS' investment strategy. And it was Mr. Farber who attended the vast majority of the auctions. David Butler played mostly a behind-the-scenes role: he communicated with investors and lenders. Only when Mr. Farber was unavailable (e.g., when there was more than one auction on a day) would David travel to an auction and bid on a sale. Indeed, during the years 2005 to 2008, David was preoccupied with his design business and devoted only 10 percent of his time to CCTS.

From Mr. Farber, David learned of the culture that pervaded the New Jersey tax lien business. It was a "travelling circus," as the regulars moved from municipality to municipality to buy liens. There were representatives from large Wall Street firms, regional banks and smaller entities like CCTS. There was a pastor who purchased liens for his church and a retired police chief; and there was a camaraderie that came from spending time together, day after day, at the sales. In due course, David learned that liens were being "picked" -- i.e., that the regulars were rigging auctions to ensure that each received one good lien (or, on occasion, two) at a favorable interest rate. David knew that "picking" was wrong. He was lulled into a false sense of comfort by the fact that that practice had gone on undisturbed for many years before CCTS arrived on the scene. Often, the tax collectors fostered a sense of comfort.

**ZUCKERMAN SPAEDER** LLP

Honorable Susan D. Wigenton
March 14, 2016
Page 5

Unlike most auctioneers, they had no incentive to encourage competitive bidding; it did not benefit the municipality and made the auction last longer. The result was an environment in which tax collectors would sometimes ask if the sale was "worked out" or would accept the first bid even when others were willing to do better.

In late November 2008, David and Mr. Farber, along with a wealthy New Jersey businessman, formed CCTS Capital to have more money to invest. David told the businessman about the anti-competitive practices and helped train new employees in bidding techniques that included picking liens. In late December, Mr. Farber learned of indictments in Baltimore for rigging tax lien auctions and brought the indictments to David's attention. A decision was quickly made to stop picking. Picking liens was not only illegal but unnecessary; CCTS Capital could earn high returns without it. And so in January 2009, David travelled to a sale in Buena, New Jersey, and announced that CCTS Capital would no longer pick, and Mr. Farber travelled to Pittsgrove and made the same announcement.

In all, CCTS bid at 675 auctions, of which approximately 84 were "picked" sales. David bid at 74 auctions and picked at less than ten. His conduct was clearly wrong, and his poor judgment continues to haunt him. See Letter of Alan Cohen ("this experience has humbled him greatly").

C.   Good Deeds

Other than the conduct described above, David Butler has lived an estimable life. Several aspects of that life merit discussion.



Honorable Susan D. Wigenton
March 14, 2016
Page 6

       1.    <u>Jewish Community Center</u>.  Next to his family, David is most proud of his role in building the Jewish Community Center in Cherry Hill, New Jersey.  The center opened in 1997 and has become the center of life for residents of the Cherry Hill community -- people of all ages, races and religions.  A 130,000 square foot facility, it includes a senior center, an early childhood center, a gymnasium, swimming pools, a library, a Holocaust museum, a social hall, and an art gallery.  It also houses numerous social service agencies, including Jewish Family and Children Services.

       David personally raised more than $13 million of the $18 million needed to build the center (it took 10 years to build) and oversaw its construction.  In his letter to the Court, Barry Tuman, a close friend, describes David's role:

> David had a vision of dramatically adding to the services offered to seniors, adults and children in our community by moving the [center] to a new larger location, closer to emerging population centers, and creating a community hub . . . .  The task was immense.  The vision David had took almost 10 years to accomplish, but it got successfully completed with him leading the team . . . .  In my view as someone who was intimately involved, it would never have been completed without the dedication, drive and commitment of David Butler whose time spent on the project dwarfed everyone else's.  He spent countless hours over the 10 year completion cycle sweating the details . . . .  The Southern New Jersey community derives tremendous on-going benefit from what he was able to visualize and drive to completion.

Letter of Barry Tuman.  In the words of one community member, "it [is] the 'JCC that David built.'"  Letter of Steven Janove.



Honorable Susan D. Wigenton
March 14, 2016
Page 7

Others sound the same theme. Letter of Nancy Cutler ("David's passion and commitment to do great work in our community was infectious"); letter of Jacob Rosner (David "pioneered the idea to buy a vacant plot of land in a busy part of our town . . . to build a state of the art JCC; every time I drive by that building, it is packed"); letter of Alan Cohen (David's "leadership . . . propelled our community to great heights by providing a facility for both young and old, [one that] my 81-year-old mother and my children take advantage of"); letter of Rabbi Steven Lindeman ("he made a qualitative improvement in the life of [our] community for multiple generations"); letter of Joel Kaber ("I dare say without David's hands on, daily involvement we would not have been successful in completing our community institution").[2]

  2. <u>Maccabi Games</u>. The Maccabi Games are an international sports competition for Jewish youth. In 1988, David took a group of 50 South Jersey youngsters (12 to 15 years old) to Chicago to compete against teams from other cities and countries. It was the first time that South Jersey youths participated. Eleven years later in 1999, 1300 youngsters from around the world gathered in South Jersey for the games, for which David was the co-chairperson. Two thousand South Jersey residents served as volunteers hosting the youth and supporting the events.

  The 1999 games were the first in which the youngsters engaged in a day of community service called "Day of Caring, Day of Sharing." The day was David's idea, and it has since become a standard part of the Maccabi Games program. <u>See</u> Letter of Ilyse A. Janove

---

[2] Pictures of the community center and other relevant material are included in Appendix B.



Honorable Susan D. Wigenton
March 14, 2016
Page 8

("David recognized the value of community service and was a great cheerleader for our efforts").[3]  This past year, the games returned to South Jersey, with 1,500 youngsters participating in sports and community projects.

In his letter to the Court, Jed Margolis, the Executive Director of Maccabi USA writes:

> Throughout my years of involvement as a professional . . . at Maccabi USA, David stands out as one of the top people that I have worked with.  He is hard working, smart, caring, engaging, fair and upfront.

Letter of Jed Margolis; see also Letter of Nancy Cutler ("[o]ur town was so proud to host the games, [and David's] enthusiasm and determination led the hundreds of volunteers to . . . g[i]ve all the teen athletes a week of memories that would last a lifetime").  Notably, David became involved in the Maccabi Games well before his own children were old enough to participate.

       3.    <u>Employer</u>.  David has always taken pride in his relationship with those who have worked for him.  In July 2009, David raised money to start a new tax lien fund, named

---

[3]  Steven Janove describes David's role:

> My wife Ilyse was one of the thousands of volunteers as she chaired the Maccabi Games' "Day of Caring." Ilyse saw up close David's leadership and organizational skills, generosity, level-headedness and problem solving as thousands of people came together to participate in the doing of good deeds with the simple purpose of helping the less fortunate.  The Maccabi Games and the Day of Caring were a resounding success -- due in large part to David Butler's leadership.

Letter of Steven Janove.



Honorable Susan D. Wigenton
March 14, 2016
Page 9

ProCapital. To this day, it continues to bid successfully on tax liens in New Jersey and other states without a hint of collusive practices. Most important for sentencing are the letters from employees, which sing David's praise as a boss. <u>See, e.g.</u>, letter of Awilda Rodriguez ("[t]here are not many owners [who] display trust, understanding, compassion, caring, and genuine concern for employees; [it] is what separates [David] as a boss [from others]"); letter of Josh Kroll (David "has a way about him that makes you feel like a valued and respected team member"); letter of Lou Altomari ("[t]he employees were always included in the running of the business [and] in [David's] life"); letter of Christina Peters ("during my interview [David made clear] that family always comes first"); letter of Steven Brown (David "never makes anyone feel unimportant or unappreciated").

    4.    <u>Teaching Art Classes</u>. In January 2015, David retired from the tax lien business.[4] Although he had always spent some time painting, it has now become a passion.[5] David has also decided to return to the career he initially thought would be his: he now teaches art to seniors at an assisted living center (one morning a week), to adults at the Jewish Community Center (one day a week) and to urban youth (one day a week for four hours) at the UrbanPromise Private Day School in Camden.

---

[4] There were several reasons for David's decision to retire, but one was his health. David developed stage three prostate cancer in 2014. After more than 40 days of radiation treatment and two years of hormone therapy, he is now cancer free.

[5] Photographs of some of David's paintings are contained in Appendix C.



Honorable Susan D. Wigenton
March 14, 2016
Page 10

      Letters to the Court speak of David's dedication to these projects.  Susan Love, the Executive Director of Lions Gate Retirement Community in Voorhees, New Jersey, writes:

> David volunteers his time for the weekly art classes as well as purchases the art supplies on his own for the residents to use.  In observing David during some of his art classes, he is patient, compassionate and a wonderful teacher.  I have heard many positive comments from the residents who attend David's class about what a wonderful and genuine person he is.  I also concur with the opinions of the residents.  Out of the many various activities and classes that are offered to the residents at Lions Gate, David's art class in one of the most popular classes.

Letter of Susan Love; see also letter of Arlene Gantz Molinaro ("[David's] compassion while encouraging them to express themselves with oil paint is extraordinary; he makes them feel good about themselves as they paint . . . and gives [them] a reason to get excited to come to class").

      In her letter, Jodina Hicks, the Executive Director of UrbanPromise, a school "dedicated to serving children . . . in one of the country's most difficult and trauma-ridden communities" also lauds David's contribution:

> David's commitment to teaching art has expanded our capacity to reach teens through the arts.  He's funded the class himself, and he regularly brings supplies for the school and breakfast for the students.  Most importantly, he is creative, hard working, well prepared and invested in the work with the teens.  He takes time and interest in getting to know the students and appreciating them as individuals.

Letter of Jodina Hicks.

      David has fallen in love with the UrbanPromise program.  He now "regularly gives financially to support [its] work and . . . began sponsoring a student's tuition; and he has



Honorable Susan D. Wigenton
March 14, 2016
Page 11

. . . reach[ed] out to colleagues and friends to raise money for [the school]." Id. He is committed to helping it build a new art and theatre building in a nearby converted church. Anyone who watched David build the Jewish Community Center in Cherry Hill knows that UrbanPromise will soon have a new building.[6]

D.      Friend and Mentor

David has always supported his friends in their times of need. Dinah Watts, who has known David for 60 years since they were neighbors in Stratford, New Jersey, tells this story about David:

> I moved back to Cherry Hill, NJ from New Orleans, LA, in September, 2005 after Hurricane Katrina destroyed my neighborhood and my daughter's school. Immediately upon my arrival back to the area David and his wife Maxine, were of enormous support to my daughter and I. David bought us clothing, as we evacuated with only three changes of clothes. He made meals for us, loaned me a car for months, and helped in the search to find us a home. During this very stressful time he also called the Superintendent of the school district to expedite getting my daughter in eighth grade. I will always be grateful to David for the unsolicited, heartfelt compassion, love and support.

Letter of Dinah Watts.

David has "been there" for others as well. See, e.g., letter of Mitchell Medoff ("[t]here was at least three times that David was the person who found a new job for me"); letter of Merle and Hayward Wallner (when "Hayward suffered a heart attack and emergency surgery

---

[6]      David is also working part time as a consultant to a company that seeks to attract businesses to Camden.



Honorable Susan D. Wigenton
March 14, 2016
Page 12

. . . David was there for me during my darkest hours supporting me emotionally"); letter of Jacob Rosner ("David has instilled the confidence in me to run my own law firm . . . none of it would have happened without his encouragement and confidence in me"); letter of Ben Birnbaum ("[w]hether it was someone to talk to for sound advice, a place to stay when times were hard, confronting my mom [who was addicted to drugs] when interventions were necessary . . . Uncle David has been consistently reliable"). As his friend Alan Cohen writes, "[r]eaching out and offering help is what David is all about."

David's concern for others is also evidenced by his relationship with Eulin Prescott, a woman born in Trinidad who helped care for David and Maxine's children. Eulin has become part of the Butler family. David and Maxine sponsored her for citizenship and helped her become a home health aide after their children went to college. Ten years ago, when Eulin became sick, they invited her back to live with them. She now has leukemia, and they are devoted to helping her with her health issues. See letter of Gary & Donna Conigliaro ("[n]ow many years later with no longer a need for child care, Eulin still lives with the Butlers in their home").[7]

---

[7] David also served on the business development committee of the Elwyn Institute, a residential home where Maxine's brother has lived since he suffered brain damage in an operation. See letter of Merle and Hayward Wallner ("[i]n addition to always being a presence in Bruce Weschler's life[,] [David] has volunteered for many years . . . to help the residents and various programs at Elwyn succeed"). David reduced his involvement in Elwyn after he was indicted so that it would not be tainted by his wrongdoing.



Honorable Susan D. Wigenton
March 14, 2016
Page 13

Making a difference in so many lives is no small achievement. See United States v. Cooper, 394 F.3d 172, 177 (3d Cir. 2005)(noting that defendant's actions were not "detached acts of charity . . . . [but were] in a very real way, hands-on personal sacrifices, which have had a . . . positive impact on the lives of others").

E.   Cooperation

David was among the first persons to cooperate with the government in its tax lien investigation. He realized that the bid rigging practices were wrong and sought to make amends. As the government will confirm, he has always been truthful, never minimizing his own involvement or exaggerating anyone else's. David did not testify for the government, no doubt because he attended so few rigged auctions.

F.   Conclusion

David's participation in the tax lien scheme was aberrational. As his son Ari writes, "[David] is unquestionably one of the good guys [who] has . . . lived a life in service of lifting society up." Letter of Ari Butler. David has inspired others to devote more time to public service and to be less self-regarding. The word "mentor" repeats itself in the letters to the Court because David has been a mentor for so many.

More than 10 years ago, the United States Supreme Court reminded that the "uniform and constant tradition for the sentencing judge [is] to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Koon v. United States, 518 U.S.



Honorable Susan D. Wigenton
March 14, 2016
Page 14

81, 113 (1996). This matter has hung over David Butler for more than six years since the government's investigation began. It has tarnished his reputation and caused him great pain. See letter of Melanie Butler Freedman ("I imagine that . . . when [David] reflects on his life . . . he silently talks to his late parents and hopes they remain proud of him"). There were human failings here, but there is so much that mitigates those failings in David Butler's extraordinary life. On this record, a non-custodial sentence would be fair and parsimonious.[8]

Respectfully submitted,

Paul Shechtman

PS/wr
Attachment

cc:   AUSA Grace Pyun
      AUSA Steven Tugander

---

[8] The so-called "parsimony provision" of 18 U.S.C. § 3553(a) requires that sentences be only as long as necessary to serve the purpose listed in Section 3553(a)(2). See United States v. Arrelucea-Zamudio, 581 F.3d 142, 155 (3d Cir. 2009)(a sentencing court must "give meaningful consideration to . . . the command . . . set forth in subsection (a)(2) -- the so-called parsimony provision").